UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DONALD E. CARLSON, ET AL.,

       Plaintiffs,

v.                                  Case No.  8:05-cv-1380-T-24 TGW

FEDEX GROUND PACKAGE
SYSTEM, INC.,

       Defendant.
_____/

**<u>ORDER</u>**

     This cause comes before the Court on Defendant's Motion for Summary Judgment.
(Doc. No. 131).  Plaintiffs oppose the motion.  (Doc. No. 143, 160).  Defendant has filed a reply
brief.  (Doc. No. 162).  For the reasons stated below, the motion is granted in part and deferred in
part.

**<u>I.  Standard of Review</u>**

     Summary judgment is appropriate "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). The Court must draw all inferences from the evidence in the light most favorable to the
non-movant and resolve all reasonable doubts in that party's favor.  <u>See</u> <u>Porter v. Ray</u>, 461 F.3d
1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of
showing the Court, by reference to materials on file, that there are no genuine issues of material
fact that should be decided at trial.  <u>See</u> <u>id.</u> (citation omitted).  When a moving party has
discharged its burden, the non-moving party must then go beyond the pleadings, and by its own
affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

This case was originally filed on June 28, 2005 regarding the business relationship

between Defendant FedEx Ground Package Systems, Inc. and its drivers.[1]  The case was

transferred to multi-district litigation ("MDL") on October 25, 2005.  The plaintiffs in the

transferred cases were people that had contracted with Defendant to provide package pick-up

and delivery services.  The MDL court determined that the plaintiffs were independent

contractors, rather than employees, of Defendant.  As a result, the MDL court granted summary

judgment in favor of Defendant on five of the seven claims in the Third Amended Complaint.

After the MDL court entered its summary judgment order, it remanded this case back to this

Court to consider the two remaining claims: (1) False Information Negligently Provided (Count

III) and (2) Breach of Contract (Count IV).  Only three plaintiffs remain in this case, Sheree

Harting, Troy Upman, and David Mosher (collectively referred to as "Plaintiffs").[2]

Plaintiffs each entered into Operating Agreements ("OA's") with Defendant.  Upman and

Harting entered into Home Delivery OA's with Defendant, which gave them a proprietary

interest in delivering to and picking up packages from a specific zip code.  Mosher entered into a

Ground Delivery OA with Defendant, which gave him a proprietary interest in delivering to and

picking up packages from a specifically described geographic area.  The areas in which Plaintiffs

---

[1]Plaintiff David Mosher was a named plaintiff in a related case (8:05-cv-1751-T-27-EAJ) filed on September 19, 2005.  However, Mosher was added to this case on January 6, 2006 while this case was pending in MDL.

[2]Plaintiffs Donald Carlson, Charles House, and Stephen Renberg have settled their remaining claims against Defendant.

had a proprietary interest were referred to as their Primary Service Area ("PSA").

In addition to delivering to and picking up packages from their PSA's, Plaintiffs' OA's specified that they could be asked to deliver to and pick up packages from other areas outside of their PSA's.  (Doc. No. 132-4, Ex. D, p. 213; Doc. No. 132-6, Ex. F, p. 303; Doc. No. 132-7, Ex. G, p. 345).  Conversely, Plaintiffs' OA's specified that if the volume of packages available for delivery or pick-up on a specific day in their PSA exceeded the volume that they could reasonably handle that day, then Defendant could reassign a portion of such packages to another contractor for the day.  (Doc. No. 132-4, Ex. D, p. 213; Doc. No. 132-6, Ex. F, p. 303; Doc. No. 132-7, Ex. G, p. 346).

Plaintiffs claim that Defendant breached their OA's and negligently provided false information to them in order to induce them to enter into the OA's and also provided false information thereafter.  Because the facts related to each plaintiff differs slightly, the Court will set forth the material facts for each plaintiff.

**A.  Mosher**

Mosher entered into an OA with Defendant on February 15, 1999.  (Doc. No. 132-7, Ex. G, p. 376).  Thereafter, Mosher decided to incorporate his business and called it D. Mosher Inc. Mosher and Defendant entered into a Signature Page Amendment that provided the following:

> THIS AMENDMENT TO THE [OA] . . . BY AND BETWEEN DAVID MOSHER (CONTRACTOR) . . . [AND DEFENDANT] IS AMENDED AS A RESULT OF THE CHANGE OF CONTRACTOR'S IDENTITY FROM DAVID MOSHER, A SOLE PROPRIETOR, TO D MOSHER INC. AN INCORPORATED ENTITY EFFECTIVE AS OF MARCH 24, 2000 . . . .
>
> BY THE EXECUTION OF THIS SIGNATURE PAGE AMENDMENT TO THE AGREEMENT, [DEFENDANT] AND CONTRACTOR EACH AGREE THAT, EXCEPT FOR THE

3

CHANGE OF CONTRACTOR'S IDENTITY MADE A PART HEREOF, THE AGREEMENT REMAINS IN FULL FORCE AND EFFECT, AND EACH PARTY AGREES TO CONTINUE TO BE LEGALLY BOUND BY THE TERMS OF THE AGREEMENT.

(Doc. No. 132-19, Ex. R, p. 745).  The Signature Page Amendment is signed by Defendant and David Mosher; Mosher's signature does not indicate that he is signing the document on behalf of D. Mosher Inc.  (Doc. No. 132-19, Ex. R, p. 745).

Mosher contends that Defendant committed four types of breaches of his OA.  First, Section 1.1 of his OA provides the following:

> [Mosher] will provide and utilize the vehicular equipment identified in the most recent Addendum 1 to this Agreement (hereinafter called the "Equipment"). . . . [S]ubject to the determination of [Defendant] of [the Equipment's] suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of [Mosher].

(Doc. No. 132-7, Ex. G, p. 340).  Mosher contends that Defendant violated this provision by requiring him to lease his vehicle through Bush Leasing.  (Doc. No. 161-1, Ex. P, p. 268-69).  Additionally, Mosher contends that Defendant violated the OA by requiring him to install a back-up camera to his vehicle, despite the fact that the OA did not contain such a requirement.  (Doc. No. 161-1, Ex. P. p. 280-81).

Second, Section 9 of his OA provides that at Mosher's election, he could choose to participate in Defendant's Flex Program.  (Doc. No. 132-7, Ex. G, p. 366).  By electing to participate, Mosher agreed to accept packages from outside of his PSA for pick-up and delivery when requested by Defendant.  In exchange, Mosher was entitled to receive a daily flex fee for each vehicle in service under his OA.  Mosher contends that Defendant violated this provision by requiring him to participate in the Flex Program.  (Doc. No. 161-1, Ex. P. p. 270-73).

Third, Section 1.15 of his OA provides the following:

> It is specifically understood and agreed by both parties that [Mosher] shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent or employee of [Defendant] shall have the authority to direct [Mosher] as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of [Defendant] shall have the authority to prescribe hours of work, whether or when [Mosher] is to take breaks, what route [Mosher] is to follow, or other details of performance.

(Doc. No. 132-7, Ex. G, p. 349).  Mosher contends that Defendant violated this provision by dictating the time that he was allowed to leave Defendant's terminal by locking the gates and not allowing him to leave until Defendant unlocked the gates.  (Doc. No. 161-1, Ex. P, p. 274-75).

Fourth, Section 5.1 of his OA provides that Mosher was responsible for a PSA assigned to him by Defendant.  (Doc. No. 132-7, Ex. G, 9. 359).  Additionally, Section 5.2 provides:

> [Mosher] recognizes that, as the customer base and package volume in the Primary Service Area increases, the geographic size of the area which [Mosher] will be able to serve with the Equipment can be expected to decrease. [Mosher] acknowledges that the increased concentration in customer base and package volume which results from a decrease in the geographic size of [Mosher's] Primary Service Area is in the interest of [Mosher], since [Mosher] will thereby have the opportunity to complete a greater number of package pick-ups and deliveries with less expense, and [Mosher] agrees to cooperate with the reasonable efforts of [Defendant] in gathering data necessary to evaluate [Mosher's] Primary Service Area . . . . [Defendant] shall have the authority, upon five work days of prior written  notice to [Mosher], to reconfigure [Mosher's] Primary Service Area to take account of customer service requirements. During such notice period, [Defendant] shall give [Mosher] the opportunity, using means satisfactory to [Defendant], to continue to provide in such Primary Service Area the level of service called for in this Agreement. In the event [Mosher] is not able to provide reasonable means to continue to service the Primary Service Area, [Defendant] may, in its sole discretion, reconfigure such area.

(Doc. No. 132-7, Ex. G, p. 359-60).  Finally, Section 5.3 provides:

> [T]his Agreement contemplates the recognition . . . by the parties
> hereto . . . of a proprietary interest by [Mosher] in the customer
> accounts in his/her Primary Service Area as that area is configured
> from time to time, and a consequent right of [Mosher] to receive
> payment in the event his/her Primary Service Area is reconfigured
> with the result that customers previously served by [Mosher] are
> reassigned.

(Doc. No. 132-7, Ex. G, p. 361).  Mosher contends that Defendant violated these provisions by: (1) reconfiguring his PSA five times between 2002 and 2005, (2) failing to give him notice for each of the reconfigurations and the opportunity to retain his entire PSA, and (3) failing to pay him for the reconfigurations.  (Doc. No. 144-7, Ex. G, p. 83-87; Doc. No. 161-1, Ex. P, p. 276-280).

Additionally, Mosher contends that Defendant falsely told him that his truck would be loaded each morning with packages for him, but it was not.  (Doc. No. 144-2, Ex. B, p. 13; Doc. No. 132-19, Ex. R, p. 732-38).  Instead, from day one, Mosher had to help load his truck.  (Doc. No. 132-19, Ex. R, p. 733-35).  However, Mosher admitted at his deposition that Defendant never told him that his truck would be loaded, but instead, he assumed that his truck would be loaded because Defendant hired part-time pre-loaders to do such work.  (Doc. No. 132-19, Ex. R, p. 724-25, 732).

### B.  Upman

Upman entered into an OA with Defendant on February 10, 2001.  (Doc. No. 132-6, Ex. F, p. 326).  Upman contends that in 2000, prior to executing his OA, Defendant told him that he would be delivering small packages utilizing a cargo van.  (Doc. No. 144-11, Ex. K, p. 158-59).  However, Defendant continuously changed the size/type of vehicles required.  (Doc. No. 161-2, Ex. Q, p. 283-84).  As a result, when Upman attempted to sell his route, he was unable to sell his

cargo van with his route.  (Doc. No. 161-2, Ex. Q, p. 283-84).

Additionally, Upman contends that prior to executing his OA, Defendant described the entrepreneurial opportunity that the OA would provide him, including being his own boss, having a proprietary interest in delivering and accepting packages within a specific zip code, hiring other drivers, and buying other vans and routes.  (Doc. No. 144-11, Ex. K, p. 159-61, 169).  Upman contends that Defendant falsely represented that he could hire other drivers, because Defendant initially would not allow him to hire his wife as a supplemental driver due to her prior convictions for DUI and petty theft.  (Doc. No. 144-4, Ex. D, p. 36; Doc. No. 132-22, Ex. U, p. 798).  Additionally, Upman contends that Defendant's refusal to allow him to hire his wife was a breach of Section 2.2 of the OA, which provides that Upman may employ drivers to assist him, as long as the driver is qualified under Defendant's Safe Driving Program Standards.  (Doc. No. 132-6, Ex. F, p. 307).  Upman, however, has not provided the Court with a copy of Defendant's Safe Driving Program Standards that were in effect at the time that he was trying to get his wife approved as a driver.  At some point, Defendant approved Upman's wife as a driver.  (Doc. No. 132-17, Ex. Q, p. 633).

Upman also contends that Defendant violated Sections 6.2 and 6.3 of his OA (which are nearly identical to Sections 5.2 and 5.3 of Mosher's OA).  Specifically, Upman states in his supplemental brief of facts that Defendant reconfigured his route without following the terms of Section 6.2, and he was not paid for the reconfiguration in accordance with Section 6.3.  (Doc. No. 160, p. 4-5).  However, Upman fails to cite to specific evidence in the record to directly

support this contention.[3]

### C. Harting

Harting entered into an OA with Defendant on November 4, 2000. (Doc. No. 132-7, Ex. D, p. 236). Thereafter, Harting decided to incorporate her business and called it Hartson Services Inc. Harting informed Defendant of this change, and Defendant's records reflect that Harting's tax identification information was changed from Sheree Harting to Hartson Services Inc., effective as of March 6, 2002. (Doc. No. 132-15, Ex O, p. 570).

Harting contends that Defendant made several false statements that she relied on when deciding to enter into her OA. Specifically, Harting contends that Defendant's marketing materials advertised the job as consisting of delivering packages using cargo vans. (Doc. No. 144-13, Ex. M, p. 226; Doc. No. 144-14, Ex. N, p. 259-60). Harting contends that Defendant quickly and repeatedly changed the van size requirements until it was no longer a van at all. (Doc. No. 161-4, Ex. S, p. 296-97). However, Harting acknowledged at her deposition that Defendant's statement that a van could be used to deliver packages was not false at the time that

---

[3]Upman cites to Document Number 161-2, Exhibit Q, pages 285 to 287 in support of his contention that Defendant reconfigured his route without following the terms of Section 6.2 and that he was not paid in accordance with Section 6.3. However, these designated pages of the record merely show that Upman asked for his route to be reconfigured and Defendant had someone ride with Upman to evaluate his route. (Doc. No. 161-2, Ex. Q, p. 285). Upman's route was reconfigured a few times. (Doc. No. 161-2, Ex. Q, p. 285-86). Upman acknowledges that he did not ask for compensation for packages delivered by other people within his zip code/PSA, but he does not specifically state that he did not receive compensation that was required under the OA. (Doc. No. 161-2, Ex. Q, p. 286-87). It is not clear whether Upman was entitled to compensation for packages delivered by others within his zip code/PSA, because Section 1.10(a) provides that if the volume of packages available for delivery or pick-up on a specific day within his PSA exceeded the volume that he could reasonably handle that day, then Defendant could reassign a portion of such packages to another contractor for the day. (Doc. No. 132-6, Ex. F, p. 303).

the statement was made.  (Doc. No. 132-15, Ex. O, p. 538-39).

Additionally, Harting contends that Defendant provided false information about the costs and income for drivers.  Specifically, Plaintiffs submitted two exhibits containing Defendant's marketing materials that provided estimates of costs and income, and Harting contends that the cost estimates (such as the estimates for tires, gas, and insurance) were inaccurate.  (Doc. No. 144-13, Ex. M, p. 222-25; Doc. No. 144-14, Ex. N, p. 254, 263; Doc. No. 161-4, Ex. S, p. 293-94).  However, the cost estimates contained in both of the exhibits specifically state that the amounts are estimates, and one of the exhibits contains the following explanation:

> The cost estimates . . . are provided for the purpose of illustration only.  The figures contained in this estimate are not guaranteed.  A . . . contractor is an independent business person and his or her costs and income will vary depending on the economy, how well he or she manages his or her business, and how well [Defendant] runs its business.

(Doc. No. 144-13, Ex. M, p. 222; Doc. No. 144-14, Ex. N, p. 254).  Furthermore, Harting questioned Defendant about the earnings projections and was told that the projections were "an example."  (Doc. No. 132-15, Ex. O, p. 540-41).

Harting contends that in 2004, after she executed her OA, Defendant made a false representation regarding the amount she would be paid in exchange for using a larger van to pick-up and deliver packages.  Specifically, Harting contends that one of Defendant's managers verbally "guaranteed" her that if she bought a larger van, a P500, she would get a larger van availability payment.  (Doc. No. 161-4, Ex. S, p. 302).  The manager told her that "he was certain that there would be an increase in [the] van availability [payment], substantial he told [her], as in double."  (Doc. No. 161-4, Ex. S, p. 303).  However, after Harting bought the P500 van, she learned that the van availability payment (which was $25 per day) had only increased

by $5.  (Doc. No. 161-4, Ex. S, p. 303).  As a result, she needed to immediately sell the van, because the van availability payment would not cover the cost of the van.  (Doc. No. 161-4, Ex. S, p. 303).

Harting also contends that Defendant imposed additional requirements that were not contained in her OA regarding the sale of her route.  Specifically, Harting contends that Defendant required her to get prior approval from Defendant in order to sell her route and that Defendant had to approve the buyer and the buyer's driver.  (Doc. No. 161-4, Ex. S, p. 298).  However, Section 15 of her OA specifically provides that Harting can assign the OA to a replacement contractor as long as the replacement contractor is acceptable to Defendant as being qualified to provide the services under the OA.  (Doc. No. 132-4, Ex. D, p. 234).

Harting also contends that Defendant breached Section 2.2 of her OA, which provides that Harting may employ drivers and that such people must be qualified under Defendant's Safe Driving Program Standards.  (Doc. No. 132-4, Ex. D, p. 217).  Specifically, Harting contends that Defendant took an unreasonable amount of time (up to three months) conducting background checks on the drivers and had intimidated one of Harting's drivers.  (Doc. No. 161-5, Ex. T, p. 308-09).

Harting also contends that Defendant breached Sections 6.2 and 6.3 of the OA, which provides the procedures for reconfiguring her PSA and payment upon reconfiguration (these provisions are nearly identical to Sections 5.2 and 5.3 of Mosher's OA).  When Harting executed her OA, her PSA was the 34652 zip code.  (Doc. No. 132-4, Ex. D, p. 244).  Harting contends that in the beginning of 2001, Defendant took parts of her route away (Clearwater Beach, Fourth Street, and Feathersound) and did not pay her for them.  (Doc. No. 161-4, Ex. S, p. 304-07; Doc.

10

No. 132-15, Ex. O, p. 556-65).  However, it is not clear whether the parts of her route that were taken away were within her PSA (the 34652 zip code) or whether they were within her supplemental routes that she was covering.  (Doc. No. 132-15, Ex. O, p. 556-65).

### III.  Motion for Summary Judgment

Defendant moves for summary judgment on both the breach of contract and false information negligently supplied claims.  Accordingly, the Court will analyze Defendant's arguments with respect to each claim.

### A.  Breach of Contract

Defendant makes four arguments to support its contention that it is entitled to summary judgment on Plaintiffs' breach of contract claim: (1) Plaintiffs cannot identify a breach; (2) Mosher and Harting lack standing to pursue this claim; (3) the applicable statute of limitations bars breaches that occurred outside of the limitations period; and (4) there is no evidence that any breach caused damages.  Accordingly, the Court will address each argument.

### 1.  Identification of a Breach

Defendant argues that Plaintiffs' breach of contract claim fails because they cannot identify a breach.  Accordingly, the Court will review the alleged breaches identified by Plaintiffs.

### a.  Mosher

Mosher contends that Defendant committed four types of breaches of his OA.  First, Mosher contends that Defendant breached Section 1.1 of his OA by requiring him to lease his vehicle through Bush Leasing.  Second, Mosher contends that Defendant violated Section 9 of his OA by requiring him to participate in Defendant's Flex Program.  Third, Mosher contends

that Defendant violated Section 1.15 of his OA by dictating the time that he was allowed to leave Defendant's terminal.  Fourth, Mosher contends that Defendant breached Section 5.1 of his OA by:  (1) reconfiguring his PSA five times, (2) failing to give him notice for each of the reconfigurations and the opportunity to retain his entire PSA, and (3) failing to pay him for the reconfigurations.  The Court rejects Defendant's argument that Mosher has not identified any breaches of his OA to the extent that he has identified these four breaches.

The Court notes that Mosher also alleges that Defendant violated the OA by requiring him to install a back-up camera to his vehicle, despite the fact that the OA did not contain such a requirement.  However, because Section 1.1 of his OA gives Defendant the ability to determine a vehicles's suitability for service under the OA, the Court concludes that Defendant had the ability to require that Mosher install a back-up camera to his vehicle.  Therefore, the Court concludes that Mosher cannot pursue a breach of contract claim based Defendant's requirement that he install a back-up camera to his vehicle.

### b.  Upman

Upman contends that Defendant committed two types of breaches.  First, Upman contends that Defendant's refusal to allow him to hire his wife was a breach of Section 2.2 of the OA, which provides that Upman may employ drivers to assist him, as long as the driver is qualified under Defendant's Safe Driving Program Standards.  (Doc. No. 132-6, Ex. F, p. 307). Upman, however, has not provided the Court with a copy of Defendant's Safe Driving Program Standards that were in effect at the time that he was trying to get his wife approved as a driver. Therefore, it is not clear to this Court that Upman can show that a genuine issue of material fact exists regarding whether Defendant breached Section 2.2 of Upman's OA.   Furthermore,

Defendant has not specifically addressed this alleged breach.  As a result, the Court defers ruling

on this issue at this time and will hold oral argument on this issue.

Second, Upman also contends that Defendant violated Sections 6.2 and 6.3 of his OA by

reconfiguring his route without following the terms of Section 6.2 and by not paying him for the

reconfiguration in accordance with Section 6.3.  However, Upman fails to cite to specific

evidence in the record to directly support this contention.  As a result, it is not clear to this Court

that Upman can show that a genuine issue of material fact exists regarding whether Defendant

breached Section 6.2 and/or 6.3 of Upman's OA.  As a result, the Court defers ruling on this

issue at this time and will hold oral argument on this issue.

### c.  Harting

Harting contends that Defendant committed three types of breaches.  First, Harting

contends that Defendant imposed additional requirements that were not contained in her OA

regarding the sale of her route.  Specifically, Harting contends that Defendant required her to get

prior approval from Defendant in order to sell her route and that Defendant had to approve the

buyer and the buyer's driver.  However, Section 15 of her OA specifically provides that Harting

can assign the OA to a replacement contractor as long as the replacement contractor is

acceptable to Defendant as being qualified to provide the services under the OA.  As such, the

Court concludes that Harting may not pursue this conduct as part of her breach of contract claim.

Second, Harting contends that Defendant breached Section 2.2 of her OA, which

provides that Harting may employ drivers and that such people must be qualified under

Defendant's Safe Driving Program Standards.  Specifically, Harting contends that Defendant

took an unreasonable amount of time (up to three months) conducting background checks on the

drivers and had intimidated one of Harting's drivers.  Defendant has not addressed this alleged

breach.  As a result, the Court defers ruling on this issue at this time and will hold oral argument

on this issue.

Third, Harting contends that Defendant breached Sections 6.2 and 6.3 of the OA, which

provide the procedures for reconfiguring her PSA and payment upon reconfiguration.  Harting

contends that in the beginning of 2001, Defendant took parts of her route away (Clearwater

Beach, Fourth Street, and Feathersound) and did not pay her for them.  However, it is not clear

whether the parts of her route that were taken away were within her PSA (the 34652 zip code) or

whether they were within her supplemental routes that she was covering.  Therefore, it is not

clear to this Court whether Harting can show that a genuine issue of material fact exists

regarding whether Defendant breached Section 6.2 and/or 6.3 of her OA.  As a result, the Court

defers ruling on this issue at this time and will hold oral argument on this issue.

### d.  Conclusion Regarding the Identification of Breaches

As explained above, the Court concludes that Mosher has identified four alleged breaches

as the basis for his breach of contract claim.  With regards to Upman and Harting, it is not clear

whether they can show that a genuine issue of material fact exists regarding whether Defendant

breached Sections 2.2, 6.2 and/or 6.3 of their OA's.  Therefore, the Court defers ruling on this

issue at this time and will hold oral argument to address it.

### 2.  Standing

Next, Defendant argues that Mosher and Harting lack standing to pursue the breach of

contract claim to the extent that the claim relates to breaches that occurred after Mosher

transferred his interest in his OA to D. Mosher, Inc. (in 2000) and Harting transferred her interest

14

in her OA to Hartson Services Inc. (in 2002). However, while it appears that the parties acted in accordance with a recognition that Mosher transferred his interest in his OA to D. Mosher, Inc. and that Harting transferred her interest in her OA to Hartson Services Inc., Defendant fails to cite to evidence formalizing this. Specifically, Defendant does not cite to a formal assignment of interest from Mosher to D. Mosher, Inc. or from Harting to Hartson Services Inc. Furthermore, Defendant does not cite to any evidence where Defendant and the corporate entities executed any documents to signify a relationship between Defendant and the corporate entities. Finally, the Court notes that it finds it curious that this case has been pending for eight years, and this is the first time that Defendant raised the issue of standing.

However, whether Mosher and Harting have standing to pursue their breach of contract claim goes to this Court's subject matter jurisdiction, and the Court would like to resolve this issue prior to trial. As such, the Court defers ruling on this issue at this time and will hold oral argument on this issue.

### 3. Statute of Limitations

Next, Defendant argues that the applicable statute of limitations bars breaches that occurred outside of the limitations period. Specifically, Defendant argues that Pennsylvania's four-year limitations period applies due to the choice of law provision in the OA's designating that Pennsylvania law applies. Plaintiffs respond that Florida's five-year limitations period applies.

When dealing with a contractual choice of law provision in a diversity case brought in Florida, Florida courts consider the statute of limitations to be controlled by such a provision:

> A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. Under Florida rules,

statutes of limitations are considered substantive in nature. Moreover, under Florida law, a choice of law provision functions to supply a rule of decision for the *substantive* rights of the parties. Therefore, under Florida choice of law rules, a choice of law clause selecting the application of [an identified state's] law will generally include the application of [the identified state's] statute of limitations.

Generally, Florida  enforces choice-of-law provisions as to contractual claims unless the law of the chosen forum contravenes strong public policy. Additionally, the party who seeks to prove such a provision invalid because it violates public policy bears the burden of proof.

Western Group Nurseries, Inc. v. Ergas, 211 F. Supp.2d 1362, 1366 (S.D. Fla. Feb. 4, 2002)(internal citations and quotation marks omitted); see also Gaisser v. Portfolio Recovery Associates, LLC, 571 F. Supp.2d 1273, 1276 (S.D. Fla. Aug. 5, 2008); Lopez v. Capital One Bank (USA), NA, 2009 WL 6713593, at *2 (Fla. Cir. Ct. Aug. 18, 2009).  Thus, under Florida's choice of law rules, this Court concludes that the choice of law provision in the OA's dictates that Pennsylvania's statute of limitations applies.  Plaintiffs have not argued that applying Pennsylvania law violates Florida's public policy, and as such, the Court rejects Plaintiffs' argument that Florida's statute of limitations applies.  Given that the Court has concluded that Pennsylvania's four-year limitations period applies, the Court must evaluate the timeliness of the breach of contract claim as to each alleged breach.

### a.  Mosher

Defendant contends that Mosher should not been deemed to have filed suit for statute of limitations purposes until January 6, 2006 (the date that he was added to this case), which would bar his breach of contract claim to the extent that it is based on breaches that occurred prior to January 6, 2002 (he entered into his OA on February 15, 1999).  Plaintiffs contend that his filing date should relate back to the filing date of this case (June 28, 2005), or at the very latest, the

16

date that he filed the related case (September 19, 2005).

The parties have not sufficiently briefed this issue. Furthermore, it is not completely clear when the alleged breaches occurred (other than the reconfigurations that occurred between 2002 and 2005, which fall within the limitations period), and without such information, the Court cannot analyze the effect of the statute of limitations. Accordingly, the Court defers ruling on this issue and will hold oral argument on it.

### b.  Upman and Harting

Defendant argues that because Upman and Harting filed this case on June 28, 2005, any alleged breaches that occurred prior to June 28, 2001 are barred by the applicable limitations period. As previously stated, the parties have not sufficiently briefed this issue. Furthermore, it is not completely clear when the alleged breaches occurred, and without such information, the Court cannot analyze the effect of the statute of limitations. Accordingly, the Court defers ruling on this issue and will hold oral argument on it.

### 4.  Damages

Next, Defendant argues that there is no evidence that any breach caused damages. However, as set forth above, it is not entirely clear which alleged breaches have been sufficiently shown and are not barred by the statute of limitations. As such, the Court defers ruling on the issue of whether there is any evidence of damages at this time. Instead, the Court will hold oral argument on this issue.

### B.  False Information Negligently Provided

Plaintiffs also assert a claim of false information negligently provided. Defendant makes several arguments to support its contention that it is entitled to summary judgment on this claim.

However, the Court need only address the following arguments: (1) Defendant did not make a false statement regarding a material fact; and (2) Plaintiffs did not justifiably rely on information given by Defendant. Accordingly, the Court will address each argument.

### 1.  False Statement of Material Fact

Defendant argues that it is entitled to summary judgment because it did not make a false statement regarding a material fact.  Accordingly, the Court will review the alleged false statements identified by Plaintiffs.

### a.  Mosher

Mosher contends that Defendant falsely told him that his truck would be loaded each morning with packages for him, but it was not.  Instead, from day one, Mosher had to help load his truck.  However, Mosher admitted at his deposition that Defendant never told him that his truck would be loaded, but instead, he assumed that his truck would be loaded because Defendant hired part-time pre-loaders to do such work.  As such, the Court concludes that Mosher has not identified a false statement that can support his claim.[4]

### b.  Upman

Upman identifies two allegedly false statements.  First, Upman contends that in 2000, prior to executing his OA, Defendant told him that he would be delivering small packages utilizing a cargo van.  Upman contends that this is an actionable false statement, because Defendant continuously changed the size/type of vehicles required.  The Court rejects Upman's

---

[4]Defendant also argues that even if this was an actionable false statement, it would be barred by the applicable four-year limitations period, because Mosher acknowledges that he had to help load his van from day one.  The Court agrees with Defendant.  Given that Mosher entered into his OA on February 15, 1999 and the falsity of his assumption would have been immediately apparent, the four-year limitations period expired long before this suit was filed.

contention, because Upman has not shown that Defendant's statement that he could deliver and pick-up packages using a cargo van was false at the time that the statement was made. Therefore, the Court agrees with Defendant that this is not an actionable statement.

Second, Upman contends that prior to executing his OA, Defendant falsely represented that he could hire other drivers. Upman contends that this statement was false, because Defendant initially would not allow him to hire his wife as a supplemental driver due to her prior convictions for DUI and petty theft. The flaw in this argument is that Section 2.2 of his OA provides that Upman may employ drivers to assist him, as long as the driver is qualified under Defendant's Safe Driving Program Standards. Upman, however, has not provided the Court with a copy of Defendant's Safe Driving Program Standards that were in effect at the time that he was trying to get his wife approved as a driver, and as such, he has not shown that he was entitled to have his wife approved as a driver. Furthermore, at some point, Defendant did approve Upman's wife as a driver, which undercuts his argument that a false statement was made. Accordingly, the Court concludes that Upman has not identified a false statement that can support his claim.

### c. Harting

Harting identifies three types of allegedly false statements. First, Harting contends that Defendant's marketing materials advertised the job as consisting of delivering packages using cargo vans, but Defendant quickly and repeatedly changed the van size requirements until it was no longer a van at all. However, Harting acknowledged at her deposition that Defendant's statement that a van could be used to deliver packages was not false at the time that the statement was made. As such, the Court agrees with Defendant that this is not an actionable statement.

Second, Harting contends that Defendant provided false information about the costs and income for drivers.  Specifically, Plaintiffs submitted two exhibits containing Defendant's marketing materials that provided estimates of costs and income, and Harting contends that the cost estimates (such as the estimates for tires, gas, and insurance) were inaccurate.  However, the cost estimates contained in both of the exhibits specifically state that the amounts are estimates, and one of the exhibits contains the following explanation:

> The cost estimates . . . are provided for the purpose of illustration only.  The figures contained in this estimate are not guaranteed.  A . . . contractor is an independent business person and his or her costs and income will vary depending on the economy, how well he or she manages his or her business, and how well [Defendant] runs its business.

(Doc. No. 144-13, Ex. M, p. 222; Doc. No. 144-14, Ex. N, p. 254).  Furthermore, Harting questioned Defendant about the earnings projections and was told that the projections were "an example."  Given the explanation that these amounts were estimates, it is arguable whether these statements can accurately be described as false statements of purported fact.[5]  Regardless, as explained in the next section, these statements cannot be used as a basis for this claim.

Third, Harting contends that in 2004, one of Defendant's managers verbally "guaranteed" her that if she bought a larger van, a P500, she would get a larger van availability payment.  The

---

[5]Harting also appears to argue in her response brief that Defendant represented that she could grow her business, but Defendant failed to disclose that her ability to add routes was left to Defendant's discretion and that she could be forced to service unprofitable supplemental routes.  Harting, however, fails to provide specificity regarding this contention (i.e., what, specifically, Defendant stated regarding her ability to grow her business), despite the fact that the Court required a supplemental brief of facts.  Furthermore, Section 1.10(a) of her OA addresses the fact that she could be asked to service areas outside of her PSA.  (Doc. No. 132-4, Ex. D, p. 213).

Additionally, Harting cannot seriously suggest that she was entitled to be given additional routes at her sole discretion.  Defendant controlled the routes, and if a new route was available, it was up to Defendant to decide to whom to give the new route.

manager told her that "he was certain that there would be an increase in [the] van availability [payment], substantial he told [her], as in double." (Doc. No. 161-4, Ex. S, p. 303). However, after Harting bought the P500 van, she learned that the van availability payment (which was $25 per day) had only increased by $5. Defendant has not addressed this alleged false statement in its motion for summary judgment, and the Court will allow the parties to address it at oral argument.

### 2. Justifiable Reliance

Next, Defendant argues that it is entitled to summary judgment because Harting's reliance on the financial information given by Defendant was not justifiable. The Court agrees for the two reasons that follow.

First, the financial information contained in the marketing materials was explained to be an *example* of potential profitability and the costs were specifically described as *estimates* for *illustration purposes* that were *not guaranteed*. Thus, it was not reasonable for Harting to rely on the financial information as guaranteed projections.

Second, Harting's OA contains the following provision, titled "MERGER OF UNDERSTANDING": "This Agreement, the Addenda hereto, and the Attachments to the Addenda, constitute the entire agreement and understanding between the parties . . . ." (Doc. No. 132-4, Ex. D, p. 233). This merger provision makes it clear that the entire understanding of the parties is set forth in the OA. Thus, Harting could not justifiably rely on any statements made outside of her OA.

Harting argues that the merger clause does not make her reliance unreasonable, because such clauses do not bar claims for fraud in the inducement. Thus, she equates her false

21

information negligently supplied claim to a fraudulent inducement claim.  Such claims, however, are not equivalent.  Instead, her false information negligently supplied claim is more akin to a negligent misrepresentation claim.  See Bankers Life Ins. Co. v. Credit Suisse First Boston Corp., 2008 WL 1817294, at *5 (M.D. Fla. April 22, 2008).  As such, her contention—that a merger clause does not make reliance on fraudulent misrepresentations unreasonable—is of no relevance in this case.[6]  Accordingly, the Court concludes that Harting's reliance was not justified and that the financial statements cannot be used as a basis for her false information negligently supplied claim.

## IV.  Conclusion

As explained above, the Court defers ruling on Defendant's motion for summary judgment, in large part, to the extent that it relates to the breach of contract claim and will hold oral argument to address this claim further.  Specifically, the Court will address at the hearing: (1) whether Harting and Upman can show that a genuine issue of material fact exists regarding their contention that Defendant breached Sections 2.2, 6.2, and 6.3 of their OA's, (2) whether Mosher and Harting have standing to pursue their breach of contract claim, and (3) whether the four-year limitations period bars Plaintiffs' breach of contract claim (and if so, to what extent), and (4) whether Plaintiffs have sufficiently shown damages from the alleged breaches.

Likewise, the Court has deferred ruling on Harting's claim of false information negligently provided to the extent that it is based on the van availability payment.  The Court

---

[6]In fraudulent inducement cases, the law ensures that a person guilty of fraud cannot be permitted to use the law as a shield in order to profit from their intentional wrongdoing.  See Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So. 2d 334, 336-37 (Fla. 1997).  However, in the instant case, Plaintiffs have alleged that Defendant *negligently* supplied false information.

will hold oral argument to address this claim further.  However, to the extent that Plaintiffs'

assert the false information negligently provided claim based on any other statements, the Court

grants Defendant's motion for summary judgment on the claim.

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Defendant's Motion for Summary Judgment (Doc. No. 131) is **GRANTED IN**

**PART AND DEFERRED IN PART**:

(a)     The motion is **GRANTED** to the extent that Upman and Mosher assert a

claim for false information negligently provided.

(b)     The motion is **GRANTED** to the extent that Harting asserts a claim for

false information negligently provided based on Defendant's statements

regarding use of a cargo van and Defendant's financial statements that it

made prior to her entering into her OA.

(c)     The Court **DEFERS** ruling on the motion to the extent that it is directed at

Harting's claim for false information negligently provided based on

Defendant's statements regarding the van availability payment.

(d)     The motion is **GRANTED** to the extent that the breach of contract claim

is based on the following: (i) Mosher's allegation that Defendant violated

the OA by requiring him to install a back-up camera to his vehicle; and (ii)

Harting's contention that Defendant violated the OA by requiring that she

get prior approval from Defendant in order to sell her route and by

requiring that Defendant had to approve the buyer and the buyer's driver.

(e)     The Court **DEFERS** ruling on the motion to the extent that it is directed at

the breach of contract claim based on the following: (i) the four alleged breaches identified by Mosher; and (ii) Upman and Harting's contention that Defendant breached Sections 2.2, 6.2 and 6.3 of their OA's.

(2)    The Court will hold oral argument on Defendant's Motion for Summary Judgment to the extent that the Court deferred ruling, as set forth above.  Oral argument will be held on ***Wednesday, July 17, 2013 at 11:00 a.m.*** in Courtroom 17.

(3)    The Court will also address the two other pending motions—(i) Defendant's Motion for Leave to Amend its Defenses and (ii) Defendant's Motion to Strike McArthur's Expert Report—during the oral argument.

**DONE AND ORDERED** at Tampa, Florida, this 3rd day of July, 2013.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record